[No. 2134.]

## J. R. BAILEY *v.* THE STATE.

THEFT — POSSESSION.— INDICTMENT alleged that the stolen property was taken from the possession of the owner, W. H. P. The proof showed that W. H. P. was absent from the State when the property was taken, and that he had left the property in the care and control of E. J. P. and E. P. *Held,* that such proof does not support the allegation of possession. Under the facts of this case it would have been proper for the indictment to allege the possession in E. J. P. and E. P., and the taking from their possession without their consent; or to allege the actual ownership in W. H. P., and that the property was taken from the possession of E. J. P. and E. P. without the consent of either W. H. P., E. J. P. or E. P.

APPEAL from the District Court of Hopkins. Tried below before the Hon. J. A. B. Putman.

The conviction in this case was for the theft of five head of cattle, the property of W. H. Perkins, in Hopkins county, Texas, on the 7th day of April, 1884. A term of two years in the penitentiary was the penalty assessed against the appellant.

W. H. Perkins, the first witness for the State, testified that he lived in Hopkins county, Texas, about one mile north from Sulphur Springs. Witness's mother, Mrs. Eliza J. Perkins, and his brother, Ed. Perkins, lived on the same farm, but in different houses. Witness lost nine head of cattle on or about April 7, 1884. Those cattle were taken in Hopkins county without his consent. His mother lost four head of cattle at the same time. The nine head belonging to witness and the four head belonging to his mother ran together on the same range about the farm, and were frequently penned and fed at the farm by the witness and his brother Ed. The witness was absent from home when the cattle were taken. The witness had gone to Cass county to gather a herd of cattle, and was gone from home about six weeks. The cattle described were taken during that absence. Witness had no personal knowledge of the theft of the cattle described, except that they were on the range when he left Hopkins for Cass county, and were gone when he got back. On leaving home, witness left his cattle in the sole charge of his mother, Mrs. Eliza J. Perkins, and his brother, Ed. Perkins. He requested them to pen and feed the cattle when necessary during his absence. Their authority over the cattle was limited to that care, and they were not authorized to sell or dispose of a single head of witness's cattle. Witness's absence was but temporary, and he intended to return as soon as he gathered his herd in Cass county. Witness's wife went with him as far as Dangerfield, in Morris county, where she visited her father during witness's absence in Cass county.

The bunch of cattle which was taken consisted of two cows, four two-year-olds and seven yearlings. As soon as witness returned home and was informed of the loss of the cattle, he started out to hunt and inquire for them. His search over their accustomed range was unsuccessful. They ranged in Hopkins county about the fair grounds, and as far west as the bridge over White Oak creek. The first person from whom witness derived any information concerning his cattle was John Kirby, who lived on the north side of White Oak creek, about six miles from Sulphur Springs. That information

led the witness to go to Commerce, in Hunt county, Texas. Witness found B. L. Murphy on his, Murphy's, place, five miles northwest from Commerce, and received information from him which took witness to Naile's pasture in Fannin county, Texas, where he recovered four head of the missing cattle, three belonging to himself, and one to his mother. Witness took them back to B. L. Murphy's and sold them to Murphy. None of the cattle described ran at or near the defendant's house or ranche. Witness never gave his consent to defendant, John Fenlow or Green Darden to take any of the cattle. The nine head of cattle which belonged to the witness consisted of the two cows and the seven yearlings. Witness raised the yearlings. The cattle, when witness left home to go to Cass county, were in his possession on the range. They were left temporarily in the possession of Mrs. E. J. Perkins and Ed. Perkins, to be looked after while witness was gone.

Ed. Perkins was the next witness for the State. He testified that, in the spring of 1884, he lived with his mother, Mrs. E. J. Perkins, on the farm in Hopkins county, about one mile north of Sulphur Springs. Witness's brother, W. H. Perkins, lived on the same farm, but in a different house. W. H. Perkins left home to go to Cass county to buy cattle about the last of February or first of March of that year. His wife went with him. W. H. Perkins had nine head of cattle, and Mrs. E. J. Perkins four head, that ran about the farm. When W. H. Perkins left home for Cass county he placed his nine head of cattle in the temporary care and custody of the witness and Mrs. Perkins. Witness and Mrs. Perkins had absolute care and management of those nine head of cattle during the absence of W. H. Perkins. When he left, W. H. Perkins requested witness and Mrs. E. J. Perkins to look after those cattle, see that they did not stray off, and to pen and feed them when necessary. He left no authority to sell or otherwise dispose of them. The cattle described were missed from their range on or about April 7, 1884. Witness saw them about the farm on April 6, but not afterwards. Those animals never ran on the prairie north of White Oak creek, or near Bailey's ranche.

B. L. Murphy testified, for the State, that, in April, 1884, he lived about four miles south of Commerce, in Hunt county, Texas. For a number of years his business had been buying and selling cattle. Witness was in Sulphur Springs, Hopkins county, on or about the first Saturday in the month of April, 1884. He met the defendant on that day in Sulphur Springs, and defendant then proposed to sell him some cattle, he said about fifteen or twenty head. Witness

first declined to buy the cattle, as he thought he had all he then wanted, but finally agreed to take them. Defendant asked witness if he was buying cattle to sell, and if so, how soon he wanted to make a delivery. Witness replied that he wanted to deliver as soon as he could get his purchases together, as he was selling every day. Defendant then said he wanted to know, because some of the cattle he proposed to sell witness he was to get from a man who had executed a mortgage on them to another man. Witness told defendant that he was going to T. Polk's and would be there a day or two to receive cattle. Defendant then said he would deliver the cattle at witness's pasture in Hunt county. Polk lived about twelve miles from Sulphur Springs. Witness's pasture was about twenty-five miles from defendant's house. Witness went from home to Polk's, and thence to Sulphur Springs, with about four hundred head of cattle on the trip on which he encountered the defendant in Sulphur Springs, as stated. He got back to his ranche on April 9, 1884. About two miles beyond Commerce witness met the defendant in company with John Fenlow and a negro, whom he has since learned was Green Darden. They were coming then from the direction of witness's pasture. Defendant said that he had delivered seventeen head of cattle at witness's pasture,— one of them a two-year-old bull. Witness replied that he did not want a bull. Defendant replied that the bull was a good animal, and that if witness did not like it when he saw it, he would make it all right. Defendant had a memorandum description of the cattle he had delivered. Witness paid him for the cattle and went on to his pasture. Defendant at that time was drinking somewhat.

About a mile and a half from his pasture the witness saw a pair of fresh cut cow ears, and the brush of a cow's tail, lying in the lane. About four hundred head of cattle had passed over them. On the next morning witness went into his pasture and found the animals penned there by defendant,— two cows, four two-year-olds, and the balance yearlings. They were a good lot of cattle. One was a black two-year-old bull. The bush of his tail was bobbed off and his ears were fresh marked. Witness afterwards had him branded, marked and altered. W. H. Perkins afterwards came to witness's place looking for his cattle. Speigle came also, looking for his bull. The cattle witness found in his pasture were cattle of the description of those defendant said he put in there. The cattle Perkins afterwards recovered from the pasture in Fannin county were a part of the cattle witness found in his pasture, as stated. The two-year- · old black bull was branded J. 3. The ranche of the defendant was

about eight miles distant from Sulphur Springs, in Hopkins county, Texas. It was not so far from defendant's ranche to Polk's place as to witness's pasture, and in going from defendant's to Polk's one would have to cross an open prairie and two prongs of Sulphur creek. Witness had bought cattle from the defendant before this, but not in 1884. When witness paid defendant for the seventeen head of cattle, defendant told him not to say anything to Casey about the transaction. Besides those of the bull, the ears of one or two yearlings bought from defendant were fresh cut. Mr. Wilkins, one of witness's employees, received the cattle from the defendant.

Bud Jernigan testified, for the State, that he lived at Commerce, in Hunt county, Texas. Early in April, 1884, he saw the defendant, John Fenlow and Green Darden pass through Commerce, having a small bunch of cattle in their possession. They stopped at Maloney's hotel for dinner, and while there they penned the cattle in the hotel lot. They stayed in town about one hour, and then drove the cattle off towards Murphy's pasture. Some days afterwards witness saw W. H. Perkins looking for cattle. A day or two later witness saw the defendant. Defendant told him that he was hunting for Perkins; that he had understood Perkins was looking for cattle answering to the description of the cattle he sold Murphy. He said further, that from what he had learned, he thought it probable the cattle belonged to Perkins, but that he bought and did not steal them, and that if the cattle were in fact stolen from Perkins, he was satisfied that he knew who the thief was.

M. H. Lackey testified, for the State, that he lived about one mile from the defendant's house. Some time in April, 1884, a man came to where the witness was at work and asked him if he knew the whereabouts of John Fenlow's herd of cattle. Witness replied that he would find Fenlow's herd at the defendant's ranche. He said that he had a bunch of cattle he wanted to sell. Witness did not know that man, who said that his name was Ed. White, and that he lived east. He was a medium sized man, had a light moustache, red complexion, wore a brown colored overcoat, white hat, and appeared to be thirty or thirty-five years of age. He would weigh about one hundred and fifty pounds. That man passed back about two hours later, when witness called to him and asked if he succeeded in finding Lanier and in selling his cattle. He replied that he did not find Lanier, but that he sold his cattle to the defendant, provided defendant did not back out. This was the first and last time the witness ever saw that man. This occurred a few days before defendant, John Fenlow and Green Darden took a bunch of

cattle to Commerce. Soon after this, witness testified before the examining trial of the defendant.

William Casey, the next witness for the State, testified that he was in the employ of B. L. Murphy in April, 1884. On the 9th day of that month, when *en route* home from T. Polk's place with a herd of cattle, the witness with Murphy met the defendant about one mile and a half from Commerce, in Hunt county, and between Commerce and Murphy's pasture. Defendant told Murphy that he had delivered seventeen head of cattle at Murphy's pasture. Murphy paid him for the cattle. In a lane about three miles from Commerce, the witness saw some fresh cut pieces of cow ears, and the bush of a cow's tail. The ears and tail lay in the middle of the road and had been passed over by Murphy's herd of over three hundred cattle. Witness did not see the cattle put in the pasture by the defendant, until the next day. They were then in the pasture in charge of Wilkins. Among those cattle was one two-year-old black bull, freshly marked, and the brush of his tail recently cut off.

Austin Ladd testified, for the State, that he saw the defendant on April 9, 1884, about one and a half miles from Commerce, going towards Murphy's pasture with a small bunch of cattle. Witness followed and overtook him. Defendant stopped his cattle and wanted witness to receive them for B. L. Murphy; which the witness could not do. Witness then told defendant that Murphy would not receive a certain bull he had in his bunch. The bull was a two-year-old, and was not then in any way disfigured. Defendant was accompanied by two men, one a white man whose name witness had learned was John Fenlow, and the other a negro whose name was Green Darden. Defendant wanted a rope. Witness proffered to lend him one, but Fenlow said that he wanted one (to keep), and witness told him there were plenty of ropes at the pen. Defendant sent Fenlow back to Commerce to get a rope. Witness remained with the herd about thirty minutes. Witness had taken about five drinks in Commerce, and when he caught up with defendant, he took about five more. Defendant drank first, Fenlow next, the negro next, and the witness last. The herd then moved on towards Murphy's pasture. None of the animals were marked by defendant or either of his companions while witness was with them. Witness saw the same cattle in Murphy's pasture on the next day. The bush of the bull's tail and his ears had been cut since he saw him the day before. The place where defendant was when he sent Fenlow back to Commerce to get a rope, and where witness left him, was near a lane, and between the lane and Commerce.

James Speigle testified, for the State, that he lost a two-year-old bull on or about April 7, 1884, at the same time that W. H. Perkins lost several head of cattle. About six weeks later witness found his bull in Murphy's pasture near Commerce, Hunt county, Texas. His mark had been recently changed and his tail bobbed off. Witness sold the bull to Murphy. Witness lived about three miles distant from the defendant, towards Commerce. From witness's house to Murphy's pasture the distance was about eighteen miles. Witness traveled it both ways in one day over bad roads, riding hard. Witness's bull was branded J. 3.

John Kirby testified, for the State, that he lived near Speigle's place and about two miles west from the defendant. One night, early in April, 1884, and at about 10 o'clock, witness heard his dogs barking, and went to his door to see what they were barking at. The moon was shining brightly and enabled the witness to see two men distinctly, and he thought three, driving a small bunch of cattle, say of fifteen to twenty-five head. The men were about one hundred and fifty yards distant from witness. The cattle were driven in the direction of the defendant's ranche, and witness noticed that, in speaking to the cattle, the men spoke in suppressed voices. The parties may have been Weaver and others who had herds in that part of the county at that time. The State closed.

J. C. Cloud testified, for the defense, that he lived in Hopkins county about six miles from Sulphur Springs. Witness was at the defendant's ranche a day or two before defendant, Fenlow and Darden went to Commerce with a bunch of cattle. Witness went there to get a job of sheep-shearing from the defendant. Defendant was not at home when witness arrived, but a man who gave his name as White was there. A bunch of fifteen or twenty head of cattle were in the defendant's lot at the same time. White told witness that he was waiting for the defendant, in order to deliver him the cattle then in the lot. Defendant lived in his house about three miles distant from his ranche. Witness went on and did not see White any more. It was on the first or second day following that defendant, Fenlow and Darden went to Commerce with the cattle.

Carrol Crisp testified, for the defense, that he lived near the defendant, who was his brother-in-law. Witness was at the defendant's ranche on or about April 8, 1884. He saw defendant late that evening, cutting some cattle out of Lanier's herds, and witness assisted him to put them in his lot. Witness was at the same ranche on the next morning, and saw the defendant and Green Darden start off with the cattle to take them to Commerce. They started

about sunrise and went up the prairie towards Commerce. Witness afterwards heard of Perkins claiming to have lost some of his cattle.

Mrs. Ida Bailey, the wife of the defendant, testified in his behalf that she and the defendant lived on their farm in Hopkins county, about three miles from their ranche. They owned a stock of sheep, cattle and horses. Defendant, in April, 1884, had charge of a herd of Mr. John Lanier's cattle. They ran on the prairie near the defendant's ranche, and defendant looked after them. On the day before he started to Murphy's ranche below Commerce, to deliver some cattle, defendant came home from his ranche and told witness that he had bought seventeen head of cattle from Mr. White, and wanted the money from the witness to pay for them. He asked witness, as she gave him the key to the trunk in which she kept their money, how much money there was in the trunk. Witness told him that there was nearly $200. Defendant got the money and went back to the ranche. During the entire week before this occurrence, the defendant had been at home with the witness every night. He left home early on Wednesday morning to go to Commerce, taking along Green Darden, a negro man then in his employ.

Green Darden testified, for the defense, that he lived at defendant's place, about three miles from his ranche, in April, 1884. On or about the 7th day of that month, and very early in the morning, the witness went with the defendant from his home place to his ranche. On their arrival at the ranche they found a man who gave his name as White. He was a spare made man, of light complexion, with a light moustache, and weighing about one hundred and fifty pounds. There were between fifteen and twenty head of cattle in defendant's lot. Defendant bought the cattle, and went back home to get the money to pay for them. Those cattle were turned out that day with a herd of Lanier's cattle. Witness and defendant penned them that night, and marked two of the animals. If they marked the bull, witness did not recollect it. They started to Commerce with the cattle about sunrise on the next morning, to deliver the same to Mr. Murphy. The cattle were taken to Murphy's pasture on that day, and witness and defendant returned home on the same day. They got to Commerce about 11 o'clock, and back home about 9 o'clock on that night. Witness had no recollection of the bull's tail being cut off, or that his ears were cut between Commerce and Murphy's pasture. Witness did not hear all of the conversation between White and defendant when defendant purchased the cattle of White. This was the only time that witness ever went to Commerce with the defendant with cattle. Witness remembered Fenlow

going back to Commerce to get a rope. Fenlow said that he wanted the rope to use as a stake rope. After Fenlow returned with the rope the cattle were driven to Murphy's ranche. Fenlow threw the rope at the cattle, but witness could not remember that he caught any of them. Witness did not know why but two and not all of the yearlings were marked before leaving defendant's ranche for Commerce.

William Goodgion testified, for the defense, that he lived with the defendant in 1884. Defendant went to his ranche early one morning in April, with Green Darden, and very soon returned to his home and told his wife that he had bought seventeen head of cattle from one White, and that he wanted the money to pay White. His wife gave him some keys and he unlocked a trunk from which he got some money, and left again, going back towards his ranche. On the next day he drove the cattle to Commerce.

The motion for new trial raised the question discussed in the opinion.

*L. D. King,* *W. P. Leach* and *E. B. Perkins,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, and *Terhune & Yoakum,* for the State.

WHITE, PRESIDING JUDGE. It was charged in the indictment that the animal alleged to have been stolen was taken from the possession of the owner, W. H. Perkins. The evidence conclusively established that, at the time of the taking, W. H. Perkins, the owner, had been absent from home two months on business, and had taken his family with him; that, before leaving home, he had placed his cattle in charge of his mother, Mrs. E. J. Perkins, and his brother, Ed. Perkins, to look after, feed and care for; that Ed. Perkins had the exclusive control and management of the cattle, subject to his brother's orders, and was to look after and feed them.

Under these facts, we are of opinion that Mrs. E. J. Perkins and Ed. Perkins were the parties in possession of the animal when taken, and that the indictment should have alleged a taking from their possession and without their consent, or it should have alleged an actual ownership in W. H. Perkins, and that it was taken from the possession of Mrs. E. J. Perkins and Ed. Perkins, who were holding the same for W. H. Perkins, and that the taking was without the consent of all the parties. The questions involved are fully discussed and settled in the cases of *Bailey* v. *The State,* 18 Texas Ct. App., 426, and *Frazier* v. *The State,* 18 Texas Ct. App., 434.

Because there was a fatal variance between the allegation and the proof of possession, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 12, 1885.]